UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24 CR 75 SNLJ (ACL) |
| | ) | |
| DARRYL D. GOODMAN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court[1] on multiple pretrial motions filed by Defendant Darryl Goodman. The first is a Motion to Dismiss for Selective Prosecution. (Doc. 47.) Next are Motions to Suppress Evidence (Doc. 48) and Statements (Doc. 49), followed by a Motion to Dismiss Count Two on Second Amendment grounds (Doc. 50). Finally, Goodman filed Motions for Expert Disclosure (Doc. 51) and Notice of 404(b) Evidence (Doc. 52).

On May 6, 2024, officers investigated a dispatch regarding a white man wielding a gun in the driveway of a specific Caruthersville, Missouri home. Upon arriving at the residence identified by the Dispatcher, the officers determined the reported incident involved the residence next door. A white male was standing behind a fence upon the officer's arrival. A black male, who was in the driveway, immediately approached the primary investigating officer. While assessing the scene, the owner of the residence identified Goodman as the person who had the gun. At that point, the officers turned their attention to Goodman. He

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

was found to have methamphetamine and marijuana in his pants pocket. A firearm, digital scales, and a phone he had reported stolen was found in the glovebox of his vehicle. Goodman was charged with being a previously convicted felon in possession of a firearm and possession of methamphetamine with the intent to distribute.

First, Goodman requests dismissal based on selective enforcement. (Doc. 47.) He claims that the primary law enforcement officer who responded to the 911 call discriminated against him because he was a black male. He argues that "instead of conducting any investigation to determine—consistent with the dispatch information provided immediately prior to his arrival—whether the only 'white male in the driveway' had a 'firearm,' [the officer] immediately confronted Goodman, the only black man present." *Id*. at 1.

Next, Goodman claims the physical evidence seized from his person and vehicle without a warrant must be suppressed (Doc. 48), as well as the statements (Doc. 49) he made to police. As to his statements, Goodman argues that he was subjected to a custodial interrogation without the benefit of the *Miranda* warning, and that his statements were not voluntary.

Goodman's remaining Motions will be addressed in turn, including the Motion for dismissal of Count Two on Second Amendment grounds, as well as requests for disclosure of expert witnesses and notice of 404(b) evidence.

The Government filed a response in opposition to all the Motions. *See* Doc. 55. As to the allegation of selective enforcement, the Government responds that Goodman failed to show the investigating officer's interaction with him had a discriminatory motive and effect. To support this contention, the Government argues that the frisk of Goodman

"had nothing to do with race" rather was based on investigation that included questioning the 911 caller who stated Goodman was the man with the gun.  *Id*. at 9-10.  Next, the Government argues that the frisk of Goodman's person was conducted based on "reasonable suspicion that Goodman was armed and dangerous."  *Id*. at 11.  Additionally, the Government asserts that the search of Goodman's person "was justified by the plain view doctrine, the plain touch doctrine, and as a search incident to arrest."  *Id*. at 11-13.  The Government claims the search of Goodman's vehicle was pursuant to his consent and that other exceptions to the warrant requirement apply including the automobile and search incident to arrest exceptions, and that it would have been inevitably discovered because if Goodman had not consented, the investigating officer would have secured a search warrant.  *Id*. at 13-18.  The Government responds that Goodman's request for dismissal under the Second Amendment is foreclosed by Eighth Circuit precedent.  *Id*. at 6, 21-22.  Finally, the Government is aware of the disclosure obligations related to expert witnesses and 404(b) evidence.  *Id*. at 6-7, 22.  It "will abide by" those "obligations and disclose the pertinent information in advance of trial."  *Id*. at 6.

Two law enforcement officers testified at the evidentiary hearing and both parties submitted exhibits.  The exhibits include a copy of the body camera video that depicts what occurred at the location reported by the 911 caller, although the point of reference is static as it is attached to the officer's uniform.  Afterwards, the parties submitted post-hearing briefs.  (Docs. 63, 65, 66.)

In consideration of the record before the Court, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motions to Suppress and Dismiss be denied, and his discovery motions be granted in part.

## I. Findings of Fact

On May 6, 2024, Officer Wiseman and Captain Darnell of the Caruthersville Police Department ate breakfast together as they were changing shifts. Darnell completed his 12-hour shift at 6 a.m., and Wiseman was beginning his shift. At approximately 6:53 a.m., they heard a dispatch request for a Pemiscot County City car to respond to 402 East 11th Street. More particularly, the Dispatcher advised that "a 911 caller stated there is a white male in the driveway with a firearm." *See* Gov't Ex. #22.

Upon arrival to 402 East 11th Street, no one was outside. Next door, at 310 East 11th Street, however, Officer Wiseman and Captain Darnell saw a fellow officer, Cpl. James Beaver parked in front. They also saw Harrison Hostler, Jr., standing against a chain link fence inside the yard of the residence. Hostler is a white male known as "Junior Hostler." Defendant Darryl Goodman was standing in the driveway of the residence at 310 East 11th Street. Goodman is a black male.

The dispatch referenced a white man with a gun and Junior Hostler was the only white male in the area. When Officer Wiseman saw Hostler in the yard, he did not believe that Hostler would have a gun. Nor did Officer Wiseman have any reason to believe that Goodman would have a gun based on his prior interaction with Goodman. (Tr. 99.)

Upon seeing Hostler in the vicinity of the area where the Dispatcher indicated a white male with a gun was reportedly seen, Officer Wiseman declared that Hostler "ain't going to have no f—king gun." Gov't Ex. #23. *Id*. at 00:15. During the evidentiary hearing Wiseman testified, "[i]n my personal experience with Mr. Hostler, which is over 15 years or so, I've never known him to have a gun." (Tr. 82.) He explained that upon arrival, he "observe[d] Mr. Hostler standing there with his arms up on the fence. [Wiseman] could see [Hostler']s entire waistline. [Wiseman] could see both of [Hostler']s hands, and [Hostler] did not have a weapon on his person." (Tr. 89.) Captain Darnell had the same opinion of Hostler. He acknowledged, "it's possible [Hostler] could have had a small firearm on him, but I did not see a firearm, no imprinting" on his clothing. (Tr. 143.)

During the investigation of the dispatch, Cpl. Beaver was interacting with Mr. Hostler while Hostler was standing by the fence. Although there was one instance when Hostler resisted arrest five years earlier, Wiseman never knew Hostler to possess a firearm. Rather, Wiseman explained that Hostler had a history of being involved in larceny and petty larceny.[2] June Barnett, Hostler's girlfriend, was also involved in some of those alleged crimes. The residence where Goodman and Hostler were observed was a home apparently shared by Barnett, Hostler and a roommate.

---

[2] Government Exhibits #1-20 are the incident reports and conviction records for Hostler's criminal background between 2008 and 2025. None of the incidents involved firearms. The crimes investigated include Property Damage, Vandalism, Burglary, Trespass, Stealing, Tampering with a Vehicle, Assault, Resisting Arrest, Harassment, Driving While Revoked, and one involving an unidentified controlled substance. June Barnett, Hostler's girlfriend, was also involved in several of those incidents.

In addition to recognizing Hostler, Officer Wiseman also recognized the man in the driveway, Darryl Goodman.  Wiseman met Goodman a couple weeks earlier when Goodman's vehicle, an Infiniti SUV, appeared to be stuck in a ditch near a local hotel.  The frame of the SUV was hung up on the concrete curb.  During that prior interaction, Wiseman offered Goodman assistance with the vehicle.  The pair attempted to push it loose.  When that didn't work, Wiseman offered to call a tow truck for Goodman and Goodman accepted that offer.  The men carried on a conversation approximately 30 minutes while they waited for the tow truck. Wiseman noted that Goodman's eyes were watering.  Goodman advised that his eyes were bothering him and that he had a condition that caused him to not "see real good."  (Tr. 30.[3])  Once the tow truck arrived, Wiseman stood by to ensure that the tow truck operator was paid and then he left the scene.

As Officer Wiseman was on duty the morning of the 911 dispatch, after parking and exiting his patrol vehicle, he began his approach to the residence.  At the same time, Goodman walked toward Wiseman.  According to Wiseman, unlike the encounter two weeks earlier, Goodman was speaking "very sporadic."  (Tr. 32.) Officer Wiseman "couldn't hardly understand what [Goodman] was saying."  *Id*. Goodman walked toward Officer Wiseman and eventually, Officer Wiseman understood that Goodman was claiming that someone had stolen his phone and $80. Goodman also noted that his vehicle had run out of gas.  That seemed odd to Officer Wiseman, as the SUV had been backed into the driveway.

---

[3] Pages in the Suppression Hearing Transcript (Doc. 61) are referred to as "Tr. ___."

During the interaction, Hostler remained in the yard by the chain link fence. A little later, June Barnett and the couple's roommate came outside. Goodman was walking around the driveway with his pants below his bare buttocks, which was something Wiseman had never seen before.

A thorough review of the body camera worn by Officer Wiseman reveals that Goodman approached Wiseman in the driveway when Wiseman arrived. Goodman's maroon colored Infiniti SUV was parked in the driveway with the front of the vehicle facing the street. The residence had a chain link fence around the perimeter of the property, which included a gate that went the length of the driveway so that a vehicle could be enclosed within the property. The gate was open.

The undersigned's interpretation of the various exchanges depicted on the body camera footage are contained herein. Goodman spoke rapidly, in an animated fashion, and it is often difficult to discern what Goodman was saying. The initial interaction between Officer Wiseman and Goodman follows:

| | |
|---|---|
| Wiseman: | What's up, man? |
| Goodman: | Hey, nothing going on. There's nothing really going on here, I'm serious..., but… |
| Wiseman: | Huh? |
| Goodman: | …This is what's going on. I'm not from around here. |
| Wiseman: | I know where— |
| Goodman: | You know exactly who I am. |
| Wiseman: | Yeah. |

| | |
|---|---|
| Goodman: | Okay, look—I'm…, right.  Hmmm. Straight to the point.  I'm just talkin' to you. |
| Wiseman: | You can talk.  Let's just— |
| Goodman: | I came here--their roommate, Renee, and the guys, huh, the truck was locked in the thing.  An--that guy [Hostler] comes in the house. |
| Wiseman: | Your truck was locked in the what? |
| Goodman: | In the gate. |
| Wiseman: | Okay. |
| Goodman: | Okay, so I'm kinda waitin' and somebody broke in the truck… someone broke in the truck,…nothin'…they stole all my money and I ain't got no gas.  They stole all my money.  I don't think… |
| Wiseman: | When did this happen? |
| Goodman: | Just then. |
| Wiseman: | Okay. |
| *Officer*: | Is that the one that was parked at the Economy Inn all night long? |
| Goodman: | No, no, no, no.  I just got here, last night.  I… |
| Wiseman: | Do you live here? |
| Goodman: | No. |
| Wiseman: | Alright, so where's the gun involved at? |
| Goodman: | That's um, uh, what I'm trying to talk to you about. |
| Wiseman: | Straight up talk to me about it. |
| Goodman: | …I'm like, don't play games.  Don't play games.  You know what I'm sayin.'  I told you all don't play games.  I told you.  I know you.  I want to speak with you,…  Hey look, there's no gun |

involved.

Wiseman:     Okay, well, that's what the call came out as a gun involved.

Goodman:     It's a fo-, it was a fake call.

Wiseman:     It was a fake call?

Goodman:     It was a fake call, 'cause.  Can I talk to you…?

Wiseman:     This is my Captain and this is the other officer.

***

Wiseman:     I'm just tryin' to figure out what you're trying to tell me.

Goodman:     Like, I, I, dude stole all my money out of the truck.  Now he's tryin' to get away…

Wiseman:     Junior did?

Goodman:     I know he did. I, I, I…

Wiseman:     How much money is it?

Goodman:     80 f—kin' dollars…, now he has my truck. But, he's sayin' he came to the yard… And, de-de-de-de-de…, and he sayin' I ain't, well, he never did nothin'…  Why would you do it?  …I can't go nowhere cause I ain't got no gas…

Wiseman:     Okay.

Goodman:     I can't go nowhere cause I don't have no gas can in here…
Look, I can't get back to where I'm from now…  I was tryin' to tell them, I said, yeah my phone was missing.  …I ask them, give me my phone…  Call my wife.  Call the Sheriff…

Wiseman:     Where's your phone at?

*Man*:        I don't have your phone.

Goodman:     Well, this isn't your house, is it?

| *Woman*: | We have a camera, too…and it shows no one can get to his truck… |
|---|---|
| Goodman: | …I want my phone…  All I want's my phone…call the insurance company come tow my car…put gas in it… |
| Wiseman: | I remember all that, but what I'm tryin' to say is you're missing $80 and a phone, is that what you're saying? |
| Goodman: | …I put the |
| Wiseman: | Who called, who called the police? |

Gov't Ex. 23 at 00:30-2:52.  Multiple people say they don't know who called. Someone offered, "probably a neighbor."  *Id.* at 02:55.  Wiseman asked the others on scene, "And, y'all don't have his phone in there?"  They responded, no.  A woman offered that her phone was inside, and that Goodman had used her phone earlier.

While Goodman claimed that someone had stolen his cell phone and Officer Wiseman inquired of the others on scene if they had taken the phone and money from Goodman, the other people denied stealing them.  During the suppression hearing, Wiseman explained:

> I was there for a. . .white male with a gun, what was dispatched.  However, a gun was involved.  Somebody had a gun.  That's to me as far as officer safety and public safety is more important at that point in time to figure out who had the gun.

(Tr. 97-98.)

Junior Hostler continued leaning against the fence.  June Barnett and the roommate also came outside.  Captain Darnell and Cpl. Beaver were adjacent to the Infiniti and standing on the street side of the fence.  Officer Wiseman directed his

attention to Hostler, Barnett, and the roommate. Goodman walked back toward the front passenger side of his truck. Goodman continued rambling with bits and pieces of sentences that are comprehensible, as follows,

> Yes, I did. Yes, I did…was out here…sayin' somethin' about the dude out here stole somethin' and everything…say I owe him some money… my room key even missing. But, hey, I have to get my truck. I don't have no gas. …I don't even have gas.

Gov't Ex. 23 at 03:18.

Based on Officer Wiseman's prior interaction with Goodman, Goodman's behavior on May 6, 2024, and his training and experience, Officer Wiseman believed Goodman was under the influence of some type of narcotic. (Tr. at 56.)

There was discussion between the officers and other people on scene to establish who made the 911 call. June Barnett shared that she made the call. She was then asked who had the gun. Officer Wiseman testified that "She -- with her body she turned it away from Mr. Goodman and took her finger and shielded her finger and pointed it at him." (Tr. 38.) In response to that revelation, body camera footage reflects that Officer Wiseman commented, "Alright, okay, June called. She just said it." *See* Gov't Ex. 23 at 03:53. Captain Darnell also testified that June Barnett identified Goodman as the person who had a gun. (Tr. 144, 146-148.)

Officer Wiseman testified that "[o]ther than June telling me that [Goodman] was the one with the gun, I didn't know where the gun was, but I knew [Goodman] kept directing his attention toward that car." (Tr. 105.) At that time, Goodman was by his vehicle. The driver's side door was open, and he wasn't completely visible.

| Wiseman: | Hey, come on out of your car, man. |
| Goodman: | …okay, hey, look… |
| Wiseman: | Pull your pants up, your whole ass is hanging out of your pants.[4] |
| Goodman: | (moves toward Wiseman, whispering) |
| Wiseman: | Is there a weapon in here? |
| Goodman: | No, there shouldn't be. |
| Wiseman: | Shouldn't be, or isn't? |
| Goodman: | (raised voice) I know it's not! |
| Wiseman: | You mind if I take a look through there? |

*See* Gov't Ex. 23 at 04:12-04:24.  Whereas Goodman had been frequently moving toward Officer Wiseman and strongly denied the presence of a weapon in the vehicle, he responded differently to the request for consent in that he did not respond.  *Id*. at 04:25.  Goodman looked away from Wiseman, slightly angled his body toward the vehicle, stood still, and remained silent for a moment.[5]  With no response from Goodman who had been speaking nonstop, Wiseman stated, "Here, first off, drop all this shit.  I wanna make sure that you ain't got no weapon on you because I ain't tryin' to get shot."  *Id*. at 04:26.

Although not visible on the body camera video, it is apparent that Officer

---

[4] Wiseman testified that Goodman's pants were so low his buttocks were exposed (Tr. 41) and Wiseman "knew that it was going to be hard to do an accurate frisk with – pants being down. . .below his buttocks."  (Tr. 101.)
[5] Officer Wiseman testified that Goodman's hesitation "gave me cause for concern.  I automatically thought he's not telling me something or don't want to tell me something.  And it made me fear for my safety at that time."  (Tr. 40.)

Wiseman conducted a pat down search.  He then asked, "What's all that? Huh?"  *Id.*
at 04:30.  Goodman turned back toward Officer Wiseman and softly answered,
"That's what I want to talk to you about."  *Id.* at 04:33.  Wiseman directed Goodman,
"Turn around and put your hands behind your back."  Goodman continued to face
Officer Wiseman instead of turning around.  Wiseman then instructed, "Don't try to
fight me."  Goodman answered, "I'm not, no never ever," but continued to turn his
head toward Wiseman and talking quietly.  Officer Wiseman noted that Goodman
was being "too antsy" and firmly ordered Goodman to "turn around."  *Id.* at 4:42.  As
Wiseman was handcuffing Goodman, Goodman continues mumbling things that are
indecipherable.

During the suppression hearing, Officer Wiseman explained that attempting a
pat-down with Goodman's pants so low would have been a safety hazard because
Officer Wiseman would have lost control of Goodman's body and would have had to
bend over and put himself in an exposed position and vulnerable to, for example, a
headlock. (Tr. at 41-42.)  Officer Wiseman reached around the front of Goodman's
waistline. *Id.*  Officer Wiseman then frisked the outside of Goodman's front pants
pocket.  (Tr. at 41.)  On the left side of Goodman's front pants pocket Officer
Wiseman felt a large bulge.  (Tr. at 42.)  When Officer Wiseman squeezed the bulge,
"it felt like rocks were rubbing together."  *Id.*  Based on his training and experience,
Wiseman believed Goodman's pocket contained "[s]ome type of illegal drug."  *Id.*
After feeling the bulge, Officer Wiseman looked down and could see inside
Goodman's "gaped open" pants pocket.  *Id.*  He observed a clear cellophane baggie

containing a rock crystal like substance and believed it was methamphetamine.  (Tr. at 42-43.)  Officer Wiseman placed Goodman under arrest, which is when Goodman began to urinate on himself. (Tr. at 43.)

Around this time another officer came toward the passenger side of the vehicle and asked if Goodman was "pissing all over [him]self."  *See* Gov't Ex. #23 at 04:52. Officer Wiseman responded, "yeah, he's pissin' on himself, because he knows what he's got in his pocket." *Id*. at 04:53.  Goodman stated, "yes, I do; yes, I do." *Id*. at 04:55.  Goodman had urinated to a degree that it wetted the outside of his pants. Goodman continues speaking and attempts to engage Officer Wiseman while the pair move toward Wiseman's patrol vehicle.  Wiseman tells another officer, "Well, he got a whole pocket full of dope on him."  Goodman again agrees, "yes, uh, yes, I do." *Id*. at 05:04.

While escorting Goodman to the patrol vehicle, Officer Wiseman advised his Captain, "there's a gun in that vehicle somewhere." *Id*. at 05:12.  Goodman continues his ramblings, including, "I know it is." *Id*. at 05:14.  Officer Wiseman asks the other officer to retrieve some gloves for him so that he can complete the patdown and safely secure the substance from inside Goodman's pocket.  Meanwhile, Goodman continues gibberish ramblings.  He also addresses the people standing in the yard, "why you gotta do me like that G?" *Id*. at 05:26.  A male denies having called the police.  Officer Wiseman comments that if Goodman pulled a gun on them, that would be a reason to call the police, if they did call.  Goodman's incessant ramblings continued.  He stated, "I'm gonna tell you everything," *id*. at 05:35, followed by "I'm

going to tell you everything,…I'm going to tell you everything, son," *id*. at 05:38.

Wiseman answers, "okay, that's fine." *Id*. at 05:39. Goodman pleads, "…please

don't tell anyone,…" *Id*. at 05:41. Officer Wiseman was still conducting the

patdown and advised Goodman, "But, you gonna have to sit still and chill out for a

moment." *Id*. at 05:45. Goodman continues to plead with Officer Wiseman and

continues fidgeting while saying, "…please, please, please, let me tell you what's

going on…" *Id*. at 05:55. Officer Wiseman places gloves on his hands and retrieves

the contents of Goodman's pocket while instructing Goodman to "be still" several

times. *Id*. at 06:00—6:30. Captain Darnell also advised Goodman that he needs to

"be still." *Id*.

Once the patdown was completed, Goodman continues his ramblings for the

officers to "…listen, listen..." *Id*. at 06:35. Officer Wiseman asks, "where's the gun

at?" *Id*. at 06:36. Goodman continues rambling while his attention is directed at

Captain Darnell. Officer Wiseman endeavors to get Goodman's attention, stating,

"Okay, listen to me. Listen to me," followed by, "you have the right to remain silent.

Anything you say,--." *Id*. at 06:39-06:44. Goodman interrupts stating "I don't, I

don't want to remain silent." The following exchange occurred:

> Wiseman:   …I've got, I've got to talk to you. Anything you say, can and
> will be used against you in a court of law.
>
> Goodman:   Yes, sir.
>
> Wiseman:   You have a right to talk to a lawyer and have him or her present
> before any questioning. If you cannot afford a lawyer, one will
> be appointed to represent you, if you wish.

Goodman:    Yes, I know my rights,…

Wiseman:    You understand?

Goodman:    Can I talk to you all, please?

Wiseman:    In just a second.

*Id*. at 06:39-06:59.

Officer Wiseman went to the front passenger side of his patrol vehicle to examine the contents secured from Goodman's pocket.  He observed bags containing methamphetamine, *id*. at 07:26, and marijuana.  Goodman once again moved closer to Officer Wiseman who had to admonish Goodman, "stand right there and chill out." *Id*. at 07:37.  Goodman replies, "…I'm tryin' to tell you somethin', that's my whole life…"

From inside Goodman's front left pants pocket, Officer Wiseman discovered two large clear cellophane baggies containing a crystal substance as well as a gray and black sock that contained a green leafy substance and a crystal substance.  (Tr. at 45.) The Missouri State Highway Patrol Crime Lab later confirmed that the crystal substance was methamphetamine. *Id*. *See also* Government Exhibits #24 and #25. Captain Darnell also observed Officer Wiseman remove the bags of methamphetamine from Goodman's pocket. (Tr. at 161.)  Captain Darnell was not wearing a body camera as he was off duty at the time and his body camera was on the charger back at the station. (Tr. at 136, 141.)

With the controlled substances secure, Officer Wiseman told Goodman "just let me know where the gun's at." *See* Gov't Ex. #23 at 07:41.  Goodman replied, "I'll

tell you everything. Come here." *Id*. at 07:43.  Wiseman indicates he's listening,

adding, "You can talk to me from here.  Where's the gun?"  *Id*. at 07:45.  Goodman

answers, "it's in the glovebox."  *Id*. at 07:47.    Then,

> Wiseman:    Is it your's?
>
> Goodman:    No--no, it is not.
>
> Wiseman:    Okay.
>
> Goodman:    No, it is not… (continues speaking rapidly)
>
> Wiseman:    Do you care if I retrieve it for our safety?
>
> Goodman:    Yes, sir.  Git it. I'm…
>
> Wiseman:    Get it?  Okay, that's fine. I'm gonna talk to you…

*Id*. at 07:50—8:01.

If Goodman had not consented to Officer Wiseman retrieving the firearm,

Officer Wiseman would have secured the vehicle and applied for a search warrant.

(Tr. at 48.)  That practice is routine. *Id*. Caruthersville police officers apply for search

warrants in similar circumstances quite often. *Id*. Officer Wiseman would have

applied for a search warrant had there been a need for one. *Id*.

Officer Wiseman walked to the passenger side of Goodman's truck and opened

the glovebox.  The glovebox fell onto the floorboard and Wiseman commented he

was glad that didn't cause the firearm to discharge.  Captain Darnell testified that he

heard "[a] thud as the glovebox door had fell off and hit the floor."  *See* Tr. 152-153.

In addition to the gun, Officer Wiseman observed two sets of digital scales and what

he thought was Goodman's cell phone.  The audio portion of the body camera stops after Officer Wiseman uses it to take a photograph of the items located in the glovebox, which included a handgun, two sets of digital scales, and a cell phone.  *See* Gov't Ex. #23 at 08:47; Gov't Ex. #26 (photograph).   The recovery of Goodman's cell phone from the glovebox demonstrated that no one had stolen Goodman's phone.

Although the audio feature of the body camera cut out after the still image was taken, the video footage continues.  *See* Tr. 57-58.  Next, Officer Wiseman secured the firearm and spoke with Goodman.  The reflection of Officer Wiseman's face on the driver's side of the truck and Goodman's animated responses on the opposite side of the truck can be seen but not heard.  *See* Gov't Ex. #23 at 14:29.  Wiseman returns to the driver's door, then to the area of the truck bed while Goodman is still talking, *id*. at 15:00, after which Wiseman returns to Goodman's vehicle in the driveway.  He searches the interior of vehicle on the driver's side and finds $60 cash ("three $20 bills") under the seat.  *Id*. at 16:00, *see also* Tr. 49.  The discovery of $60 indicates that Goodman misplaced his money and that it had not been stolen.

Wiseman continued to search the vehicle rotating counterclockwise to the rear driver's side seat, hatchback, rear passenger seat, and the front passenger seat.  When complete, Wiseman returned to the driver's door to retrieve the cash.  *See* Gov't Ex. #23 at 16:00.  Goodman is still on the passenger side of the patrol vehicle as he continues to talk to Wiseman.  Finally, Goodman is directed to another patrol car for transport to jail.  *Id*. at 19:25.

Both Officer Wiseman and Captain Jeremy Darnell had over 20 years of

experience in law enforcement. Both officers had prior experiences receiving information from dispatch that did not turn out to be completely accurate. (Officer Wiseman, Tr. 21-22; Capt. Darnell, Tr. 146-147.) Like in this instance, they were sometimes given incorrect addresses, including addresses outside the city limits. In responding to the dispatch that morning, Officer Wiseman "was confident I was responding to a situation with somebody involving a gun." (Tr. 22.)

A review of the instant 911 call[6] (Government Exhibit #21) reveals that the 911 caller reported observing a *black* male in the driveway with a gun at *310 E. 11th Street* although the Dispatcher notified officers the subject was a *white* male at *410 E. 11th Street*. The Dispatcher's inaccurate description of the 911 caller's report was consistent with Officer Wiseman's and Captain Darnell's collective experience that dispatched information was not always completely accurate.

Goodman's primary request is for dismissal of the Indictment based on selective enforcement followed by requests for suppression of evidence and statements. He further requests dismissal of Count Two on Second Amendment grounds and identification of expert witnesses and 404(b) evidence for trial.

---

[6] Goodman objected to the admission of the 911 call based on relevance since the officers did not hear it. (Tr. 8-9.) The objection is overruled. The call is relevant as it relates to the credibility of the officers' testimony regarding their prior experience that dispatches were not always accurate.

## II.  Conclusions of Law

An examination of the above facts along with the applicable law is necessary to resolve four of Goodman's pretrial motions.  The remaining Motions will be addressed on the pleadings.  Each request will be discussed below.

### II.A.   Selective Enforcement

First, Goodman claims that he was "singled out" by the investigating officer who directed his attention to the only black male on scene rather than the only white male "even though the black male was the one who initially told law enforcement he was the victim of theft by the white man and even though police were dispatched to the scene…to find a white man with a gun."  (Doc. 63 at 5.)  Goodman further argues that "police had every reason to investigate the one white man on scene for the alleged gun crime—and no reason at all to investigate the one black man on scene for a crime dispatch…that states the person with a gun was 'white.'"  *Id*.  He asserts that "even if the Government's allegations were true, the truth is if Goodman were white—like Hostler—the unconstitutional searches never would have been conducted in the first place and Goodman would not be sitting in the defendant's chair…"  (Doc. 47 at 9.)  The record is devoid of any evidence to support these claims.

The "Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).  In *United States v. Bell*, the Eighth Circuit stated that "[a] person claiming an unequal enforcement of a facially neutral statute must show both that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory purpose." 86 F.3d 820, 823 (8th Cir. 1996) (citations omitted).

To establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not enforced against them. *United States v. Brown*, 9 F.3d 1374, 1375-76 (8th Cir. 1993). To show discriminatory purpose requires the claimant to show the official's decision to enforce the law was at least partially based on race. *Id.* at 1376. "When a claimant shows both discriminatory effect and purpose, the burden then shifts to the Government to show the same enforcement decision would have been made even if the discriminatory purpose had not been considered." *Bell*, 86 F.3d at 823 (citations omitted).

The Government argued that Goodman fell far short of proving discriminatory effect noting that "there was no one similarly situated to him at the moment Officer Wiseman frisked Goodman for weapons." (Doc. 65 at 11.) The Government further argued that Goodman "failed to carry his heavy burden to prove discriminatory motive" as the frisk of Goodman "had nothing to do with race," because Goodman was not searched until the 911 caller who was on the scene identified him as the man who wielded the gun. *Id.* at 12.

The circumstances presented here involved an officer's response to a dispatch relaying the details of a 911 call. The Dispatcher asked Caruthersville police to respond to the location where the caller observed a white male in a driveway with a gun. Officer Wiseman did not hesitate to respond to the scene. When officers respond to this type of report, they likely expect that upon arrival their observations may result in enforcement of gun laws such as unlawful use and possession of a firearm.

When Officer Wiseman arrived at the area reported by the Dispatcher, he first saw Junior Hostler, a white male. Hostler was standing inside the yard of the residence and leaning against the chain length fence that was just under shoulder height. Officer

Wiseman exclaimed there was no way that Hostler had a gun. Wiseman also recognized the second male on scene, Darryl Goodman, who is black. Officer Wiseman had a recent interaction with Goodman. He did not make any auditory comment about whether Goodman might have a gun, although Wiseman testified that he had no reason to believe Goodman was in possession of a firearm.

Rather than assume who had a firearm, without favoring any subject on scene, Officer Wiseman began to investigate. This was appropriate as there was no guarantee the person who wielded a firearm had remained at the scene. Wiseman's job was to ferret out what happened and whether a gun posed a danger to anyone by talking to the people present.

Officer Wiseman did not search anyone immediately upon his arrival. He spoke with all individuals who were present in a respectful manner. Goodman immediately approached Officer Wiseman and declared that while his Infiniti had been parked inside the gate of the residence, someone had broken into the vehicle and stolen his money. Officer Wiseman clarified where the vehicle had been located and when the theft allegedly happened. He also asked whether Goodman lived at the residence. Next, Officer Wiseman asked, "Alright, so where's the gun involved at?" Goodman responds that he wants to talk to Wiseman about it and not play games, and claimed, "Hey look, there's no gun involved." Officer Wiseman replied, "Okay, well, that's what the call came out as a gun involved." Goodman then stated that was a "fake call." Officer Wiseman and Goodman then discussed Goodman's complaint about his property being stolen. Wiseman understood that Goodman believed someone stole his money and phone. Goodman also claimed his Infiniti, that had been backed into the driveway, was

out of gas.

Officer Wiseman then asked Hostler and the two occupants of the residence whether anyone had Goodman's property. They all denied having his property and explained there was a camera that would show no one could get to Goodman's truck. One of the women noted they had allowed Goodman to use their phone earlier.

Next, Officer Wiseman asked who called the police. June Barnett was reluctant to identify Goodman as the person with the gun. She discreetly pointed in Goodman's direction in a manner that he wouldn't see she was pointing at him so the officers would know that Goodman had wielded the gun. *It was not until that revelation was made that Officer Wiseman directed his attention to Goodman.* Barnett's method of communicating who had possessed the firearm revealed that she was afraid to name Goodman as the perpetrator.

Wiseman's decision to address Goodman about whether he had a gun had nothing to do with Goodman's race and everything to do with the fact Barnett identified him as the person who had wielded a gun in the driveway. Coincidentally, Goodman was also the only person in the driveway when law enforcement arrived on the scene. Goodman takes serious offense to the fact Hostler was not patted down. The evidence shows Officer Wiseman had no basis to frisk Hostler. This includes the fact that although Goodman accused someone, possibly Hostler, as the culprit who allegedly stole his property, he did not accuse Hostler or anyone else of having possessed a gun. It was quite the opposite. Goodman was emphatic that there was no gun and the 911 call was fake.

If Officer Wiseman was not inclined to enforce gun laws on white people, he

would not have made an immediate response to the dispatch. Although he jumped to an immediate conclusion that Hostler would not have a gun, Wiseman's opinion was based on at least 15 years of prior law enforcement experience with Hostler during which Hostler was never found to possess a firearm.

Similarly, Wiseman did not have any reason to believe that Goodman would have a gun. Instead of jumping to conclusions and immediately searching any person present, Officer Wiseman investigated the report regarding a white person having a gun in the driveway. He spoke freely to the individuals present and did not restrain their movements in any way until the situation called for it. He also listened to Goodman's complaint about being a victim of theft. It was later determined that although the 911 call was not fake, Goodman's claims about his property being stolen were false. Goodman's cash and phone were located inside his vehicle.

Although not discussed above, Officer Wiseman testified that dispatches he responded to over time did not always include accurate information. In this case, the address relayed by the Dispatcher was incorrect along with the race of the subject who wielded the gun as reported by the 911 caller. That said, there's no evidence that Wiseman concluded that a black male rather than a white male was the person who wielded a gun. Officer Wiseman fully investigated the scene before determining that Goodman needed to be frisked.

The undersigned finds that Goodman failed to show either a discriminatory effect or purpose in Officer Wiseman's response to the 911 call and the way he enforced the law related to unlawful possession of firearms. The Motion to Dismiss for Selective Enforcement should be denied.

**II.B.  Warrantless Searches**

Next, Goodman claims the physical evidence seized from his person and vehicle must be suppressed as the items were seized as the result of a warrantless search.  He also moved "to suppress all evidence that was derived from information or items in the search pursuant to the fruit of the poisonous tree doctrine."  (Doc. 48 at 1, 6.)

II.B.1.  *Evidence in Goodman's pocket*

As to the search of Goodman's person, his Motion articulates that he "does not accept as true any facts as reported by the police report or any other discovery and intends to hold the Government to its burden of establishing by the evidence the legality of the searches and seizures allegedly conducted in this case."  (Doc. 48 at 3.)  This is followed by a statement that he "anticipates the evidence will establish that no exception applies in this case," including exigent circumstances, inventory search, roadside search, and consent.  *Id.* at 4-5. Goodman failed to offer specific law and facts to support his assertion that the search of his person was unlawful before or after the hearing.  Thus, the lawful basis for the search as asserted by the Government is deemed admitted.  Post-hearing, the Government argued "the frisk of Goodman was supported by reasonable suspicion and the search that followed was justified by the plain view doctrine, the plain touch doctrine, and as a search incident to arrest."  (Doc. 65 at 13.)  The Government's full response on these points is adopted and incorporated herein by reference, specifically, Doc. 55 at 10-13.

II.B.2.  *Goodman Consented to a Search of his Vehicle*

Goodman claims that he did not consent to a search of his vehicle.  He argues that "law enforcement never asked Goodman for his consent to *search* the car" and "to the extent any question inferring consent was asked, it was *after* Goodman had been subjected to police

interrogation while in custody—a lengthy period during which he was without any *Miranda* warnings." (Doc. 48 at 5; emphasis in original.) Goodman further asserts that his "consent [was] based on fraud" as Officer Wiseman's request to retrieve the gun from the vehicle for officer safety was unnecessary; and his consent was involuntary. *Id*. at 5-6. He claims that he did not give consent for a search of the entire vehicle. (Doc. 66 at 5.)

The Government responded that there were several legal justifications for the search of Goodman's vehicle, "including consent, the automobile exception, search incident to arrest, and inevitable discovery." (Doc. 65 at 14.)

The Fourth Amendment shields individuals from unreasonable searches and seizures by law enforcement. *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012). "'[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions[.]'" *United States v. Anderson*, 688 F.3d 339, 343 (8th Cir. 2012) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971)). "Voluntary consent of the person whose home or property has been searched is [a] recognized exception." *Anderson*, 688 F.3d at 343-44 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Thus, "[c]onsensual searches are reasonable under the Fourth Amendment." *United States v. Beckmann*, 786 F.3d 672, 677-78 (8th Cir. 2015) (citing *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991)).

"The boundaries of a consensual search are confined to the scope of the consent." *United States v. Schafer*, 608 F.3d 1056, 1064 (8th Cir. 2010). *See also United States v. Lemmons*, 282 F.3d 920, 924 (8th Cir. 2002) (Finding officer's statement that "he wanted to look for a camera or recordings of the neighbor's window,…[subject] initially

consented to a search only for those items.")).  To determine the scope of consent, district courts consider "what the typical reasonable person would have understood by the exchange between the officer and the suspect." *Id*. at 1064-65 (cleaned up).  Where consent is limited to a particular thing, officers are "limited to searching in only those areas in which that evidence could reasonably have been expected to be found." *Lemmons*, 282 F.3d at 924.

The burden is on the government to show that consent was freely and voluntarily given. *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990).  Consent is voluntary "if it was 'the product of an essentially free and unconstrained choice by its maker,' ... rather than 'the product of duress or coercion, express or implied.'" *Id*. (quoting *Bustamonte*, 412 U.S. at 225, 227). Courts look at the totality of the circumstances in assessing whether consent was granted voluntarily. *Id*. at 226. The voluntariness of consent is a question of fact. *United States v. Beckmann*, 786 F.3d at 678 (citing *United States v. Quintero*, 648 F.3d 660, 665 (8th Cir. 2011)). "[T]he reasonableness of an officer's reliance on such consent is a question of law …." *Id*. (citing *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003)).

As set out in *Chaidez*, district courts consider the totality of the circumstances by examining a non-exclusive list of factors, including the consenting party's age, mental ability, whether the individual was intoxicated, whether the individual was informed of their rights, and the environment in which the consent is given.  *See United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011) (citation omitted).  *See also Chaidez*, 906 F.2d at 381. The defendant's contemporaneous reaction to the search is also relevant. *Id*. The factors should not be "applied mechanically," but serve to guide the analysis.  *Id*.

The question before the Court is whether a reasonable officer could believe that Goodman's consent was valid. Under the totality of the circumstances, the undersigned concludes that: (1) Mr. Goodman's consent was voluntary; and (2) it was reasonable for Officer Wiseman to conclude that Mr. Goodman, although he appeared to be under the influence of drugs, consented to a search of the Infiniti's glovebox.

The interaction between Officer Wiseman and Goodman was captured on Wiseman's body camera. There were two additional officers on the scene although they had very little interaction with Wiseman and Goodman. Officer Wiseman spoke with Goodman and other individuals who were in the yard of the residence during the first few minutes following his arrival. *See* Gov't Ex. 23 at 00:30-3:53. Goodman's freedom of movement was not restricted in any way during this timeframe. He moved very close to Wiseman at times. He also walked away from Wiseman during that timeframe, going as far as behind the open door of his Infiniti without any monitoring.

Goodman was an adult capable of managing his own affairs. He had been staying at a local hotel for at least a few weeks, maintained his own vehicle and was able to recover it after it had been towed. He also had considerable experience with the criminal justice system as summarized by the Government. *See* Doc. 65 at 15. Goodman also had his wits about him to protect his interests by denying anyone had a gun when the officers arrived, falsely stating that the 911 call about a man in the driveway with a gun was a "fake call," and denying there was a gun in the Infiniti even though he knew he was in possession of a firearm the entire time.

Goodman was patted down approximately 45 seconds after June Barnett stated *he*

was the person who had wielded a gun in the driveway.  *See* Gov't Ex. 23 at 03:54-04:26.  Then, he was arrested.  The *Miranda* warning was given within two minutes of Goodman being placed in handcuffs.  *Id*. at 04:42-0:6:39.  During those two minutes, Officer Wiseman's attention was directed at securing gloves to remove the controlled substances from Goodman's pocket, safely securing that evidence, and deflecting Goodman's many attempts to talk about what was happening.

Goodman was not coerced, threatened or given any promises to induce his consent.  Although Goodman had been placed under arrest at the time he gave consent, he still exercised some freedom of movement and continued to speak to Officer Wiseman.  None of the officers threatened Goodman before or after his consent.

Throughout the interaction, Goodman freely spoke to Officer Wiseman and the other individuals on scene.  He repeatedly advocated for himself, claimed he was the victim of crimes that did not in fact occur, and attempted to assuage Officer Wiseman's concern that a weapon had been flourished in the driveway that morning.  Furthermore, Goodman appeared to clearly understand the questions posed to him by Officer Wiseman.

Significantly, Officer Wiseman did not hide the fact he wished to search Goodman's vehicle for a gun.  He was direct and honest about his desire to secure the firearm.  Goodman did not hesitate in giving Wiseman his consent and further advising Wiseman where the gun was located.  By this point, Goodman was desperate to cooperate.

The fact the body camera video does not show that the glovebox fell onto the floorboard when Officer Wiseman opened it is immaterial as the audio from the body

camera video confirms the glovebox broke.  Simultaneous with Wiseman's entry of the
front passenger door and movement toward the area of the glovebox, there is a sound
consistent with the glovebox falling to the floorboard.  Wiseman spontaneously declared
he was thankful the gun didn't go off.   Captain Darnell also heard the thud of the
glovebox.

Nearly all items of evidentiary value were seized from the glovebox to include the
Ruger handgun, two sets of digital scales, and Goodman's cell phone.  *See* Gov't Ex. #26.
The only other incriminating evidence was the $60 found under the driver's seat.  The
automobile exception applies to the search of the remainder of the Infiniti.  It simply
requires that a car be readily mobile and probable cause to believe it contains contraband.
*Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam).  Although Goodman claimed
the Infiniti was out of gas, Hostler had gasoline available.  If the gas tank was in fact
empty, which was not established by anything other than Goodman's statement and
called into question by the fact it had been backed into the driveway, it would only take a
moment to fill.  Either way, the Infiniti was readily mobile.  Secondly, there was probable
cause to believe the Infiniti contained contraband considering the totality of the
circumstances presented.

Additionally, absent Goodman's consent, Officer Wiseman would have secured a
search warrant for the Infiniti and the cash under the driver's seat would have been
discovered.  Application of the inevitable discovery doctrine[7] supports the admissibility

---

[7] The Government noted that "notwithstanding the other proper justifications for searching
the vehicle, out of an abundance of caution Officer Wiseman would have applied for a search
warrant to search the vehicle."  (Doc. 65 at 19.)  The undersigned finds that if it had been
necessary for Officer Wiseman to "secure[ ] and tap[e] off" (Tr. 48) the vehicle and he had

of the cash at trial.

Based on the record before the Court, the undersigned finds that Goodman voluntarily consented to the search of the Infiniti's glovebox, and it was reasonable for Officer Wiseman to believe that consent had been given. The seizure of the $60 was justified under the automobile exception to the warrant requirement and the doctrine of inevitable discovery. Thus, the request for suppression of evidence seized from the Infiniti should be denied.

## II.C.  Goodman's Statements

Third, Goodman requests suppression of the statements (Doc. 49) he made to police on the day in question. In support of this request, Goodman argues that he was subjected to a custodial interrogation without the benefit of the *Miranda* warning, and that his statements were not voluntary.

The Government responds that all of Goodman's statements are admissible and categorizes the statements in three groups: (1) statements before he was taken into custody; (2) statements while he was in custody but before receiving the *Miranda* warnings; and (3) statements after receiving the *Miranda* warnings. (Doc. 65 at 19-22.)

In *Miranda v. Arizona*, the Supreme Court prescribed warnings to be given during custodial interrogations to safeguard the Fifth Amendment privilege against self-incrimination. 384 U.S. 436, 446-50 (1966). The requirements of *Miranda* only arise when a person is both in custody and being interrogated. *See Illinois v. Perkins*, 496 U.S.

---

applied for a search warrant, there was probable cause to support such a request based on all the circumstances presented. Thus, a search warrant would have issued and been executed, and the $60 would have been recovered from under the driver's seat.

292, 297 (1990); *United States v. Head*, 407 F.3d 925, 928 (8th Cir. 2005); *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005).

A person is in custody for purposes of *Miranda* when their freedom of action is deprived in a significant way. *Howes v. Fields*, 565 U.S. 499, 518 (2012). This is an objective test based on the totality of the circumstances and turns on whether a reasonable person would feel free to leave. *Id.*

Interrogation includes both direct questioning by officers and words or actions that officers know are "reasonably likely to elicit an incriminating response form the suspect." *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "General on- the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" are not interrogations for *Miranda* purposes. *Miranda*, 384 U.S. at 477. *See also Garcia v. Singletary*, 13 F.3d 1487, 1491 (11th Cir. 1994) (prison guard's question asking why a suspect started a fire was "a spontaneous reaction to a startling event" which amounted to general on-the-scene questioning not an interrogation under *Miranda*); *Cervantes v. Walker*, 589 F.2d 424, 426-27 (9th Cir. 1978) (deputy sheriff's question, "What's this?" in response to finding marijuana in defendant's belongings not an interrogation). Voluntary statements that are not in response to interrogation are admissible with or without the giving of *Miranda* warnings. *Head*, 407 F.3d at 928.

Goodman made numerous statements at all stages of his interaction with law enforcement on May 6, 2024. Those statements will be examined by the categories identified by the Government.

III.C.1.        *Statements Made while not in Custody*

From the time law enforcement arrived at 310 E. 11th Street in Caruthersville, Missouri, Goodman talked nearly incessantly.  Goodman was free to leave up until his arrest which was approximately 4 minutes and 30 seconds into the encounter with law enforcement. Goodman was not in custody when these statements were made. As such there was no *Miranda* violation for the statements made from the moment law enforcement arrived until Goodman was arrested.

III.C.2.        *Statements made while in custody, but before Miranda warning*

The Government asserts that the next group of statements were made over a period of roughly 2 minutes and 10 seconds.  For any statements made during this timeframe, the Government avers that "if Officer Wiseman interrogated Goodman during that intervening 2 minutes and 10 seconds period, then Goodman's statements made during that period should be suppressed."  (Doc. 65 at 21.)  The Government argues that Officer Wiseman asked only two questions during this timeframe.

The issue for those two statements is whether they were made in response to interrogation.  When Officer Wiseman made the statement, "What's all that," he was not interrogating Goodman.  As stated above, there must be both custody and interrogation before the administering of *Miranda* rights is required.

First, when Officer Wiseman felt the crystal rock substance, looked down, and saw it in Goodman's open pocket and spontaneously stated, "What's all that?" Goodman's response was, "That's what I want to talk to you about."  Although a question, Wiseman's response to feeling controlled substances in Goodman's pocket was not

interrogation.  Additionally, Goodman's response was not incriminating.

Officer Wiseman's second question during this timeframe was "where's the gun at?"  Gov't Ex. #23 at 06:36.  This question could evoke an incriminating response. Before Goodman could answer, however, Officer Wiseman corrected himself.  Wiseman interrupted Goodman's pleas for the officers to listen to him and gave Goodman the *Miranda* warning over Goodman's objection. Under the circumstances faced by Officer Wiseman with a subject begging to talk, it is no surprise that Wiseman nearly forgot to give the *Miranda* warning.  With two decades of experience under his belt, however, Officer Wiseman promptly cured this near misstep and administered the *Miranda* warnings to a resistant suspect who tried to stop Wiseman from completing the warning.

Although the second question was guilt seeking, it was not answered, leaving no statement subject to suppression.

Goodman made additional incriminating statements during this timeframe.  After the patdown, Officer Wiseman commented to another officer that Goodman had urinated on himself, "because he knows what he's got in his pocket."  Gov't Ex. #23 at 04:53.  Wiseman also stated, "Well, he got a whole pocket full of dope on him." After each of those comments, Goodman agreed he had controlled substances in his pocket.  Officer Wiseman's comments were not questions directed to Goodman. Without interrogation there is no *Miranda* violation.

Based on the foregoing, none of the statements Goodman made after he was taken into custody but before he was given the *Miranda* warning should be suppressed.

III.C.3.        *Statements after Miranda warning*

After Goodman received the *Miranda* warning, he acknowledged that he

understood his rights.  He immediately inquired, "Can I talk to you all, please?"  Officer

Wiseman told Goodman it would be a minute.  Forty seconds later, Wiseman asked about

the location of the firearm.  Goodman immediately advised that it was "In the glovebox."

He also told Wiseman to "get it."  *See* Gov't Ex. #23 at 07:41-08:01.  Still, Goodman

denied that the gun belonged to him.

All statements Goodman made after receiving the *Miranda* warnings are

admissible. This would include all post-*Miranda* statements made at the scene as well as

the statements made during the later formal interview, which according to the post-hearing

briefing included a second *Miranda* warning.

Goodman's request for suppression of his statements should be denied.

## II.D.  Motion to Dismiss on Second Amendment Grounds

Count II of the Indictment charges Goodman with being a previously convicted felon

in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).   He claims that the

applicable statute "violates the Second Amendment as applied to him."  (Doc. 50 at 1.)

Goodman's prior felony convictions as recited by the Government in post-hearing briefing

include two aggravated robbery cases and one facilitation of robbery case.  *See* Doc. 65 at

15.  Goodman has not disputed these convictions.  He argues that under the Supreme Court's

decisions in *New York Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *United

States v. Rahimi*, 602 U.S. 680 (2024), his possession of a firearm for self-defense was

"presumptively lawful because it falls within the Second Amendment's plain text right to

bear arms."  (Doc. 50 at 3.)

To support his argument, Goodman sets out the customary arguments offered by defendants since *Bruen* was decided. *See* Doc. 50 at 1-18. In the end, claiming "[b]ecause the Government cannot 'meet [its] burden to identify an American tradition' that imposed a blanket prohibition on people with felonies from possessing firearms," § 922(g)(1) is unconstitutional and Count II must be dismissed. (Doc. 50 at 18.) Adding that the Government should have to prove "facts sufficient to meet its burden set by the Supreme Court as to historical roots." *Id.*

The Government responds that Goodman's claim is foreclosed by Eighth Circuit precedent noting that in dealing with post-*Bruen* challenges, "the Eighth Circuit explicitly held that, given the repeated assurances by the Supreme Court that the prohibition against felons possessing firearms is constitutional, that prohibition remains." *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) (citing cases). *Jackson* added that "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Id.*

*Jackson* further articulated:

> In sum, we conclude that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted 922 and the prohibition on possession of firearms by felons. Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson.

*Id.* at 1129. Similarly, the statute is constitutional as applied to Goodman.

Because this Court is bound by prevailing law, the undersigned must recommend that Goodman's Motion to Dismiss Count Two be denied.

## II.E.  Request for disclosure of experts and 404(b) evidence

Goodman requests "notice, no later than 60 days before trial, of any expert witness it intends to call at trial" pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G).  (Doc. 51 at 1.)  Additionally, he moves the Court "to require the Government to provide notice, no later than 30 days before trial, of its intention to rely upon evidence that falls within the scope of Federal Rule of Evidence 404(b)."  (Doc. 52 at 1.)

The Government responded that it "will comply with its disclosure obligations under the Rules and will comply with the [trial] court's pretrial order."  (Doc. 55 at 22.)

As to expert witnesses, the Government's Response to Defendant's Request for Pretrial Disclosure (filed on June 13, 2024) stated:

> The Government will provide defendant with a written summary of testimony the Government intends to use under Rule 702, 703 or 705 of the Federal Rules of Evidence during its case in chief at trial as required by Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure. This summary will include the witnesses' opinions, the basis and the reasons therefor, and the qualifications of the witness. The Government will provide this information reasonably in advance of trial.

(Doc. 21 at 5.)  The Response further stated,

> The Government may introduce into evidence in its case in chief the following testimony of expert witnesses:
>
> (a)    ATF Special Agent, who will testify in accordance with his interstate nexus report;
> (b)    MSHP Criminalist, who will testify in accordance with his/her drug chemistry report.

*Id*.

Based on the above Response, the Government disclosed the identity and reports for each of their expert witnesses more than one year ago. When a defendant elects to proceed to trial in this District, supplemental disclosures related to expert witnesses are typically filed ten days (including weekends and holidays) in advance of trial.

As to 404(b) evidence, the Government advised that "disclosure will be made at a time sufficiently in advance of trial that will permit the defense adequate time to prepare." *Id*. at 6. In this District, the usual practice related to the disclosure of 404(b) evidence is at least one week before trial. Orders relating to trial typically instruct the notice must include a short summary of the proposed evidence, identifying the specific elements of 404(b) under which the prosecution intends to introduce such evidence and the proposed jury instruction to be read before the introduction of any such evidence.

If the Government intends to offer evidence of other crimes, wrongs or acts, pursuant to Rule 404(b), Federal Rules of Evidence, during the trial of this case, it must provide notice to Goodman, at least ten days (including weekends and holidays) prior to the first day of trial. The notice must include the general nature of any such evidence that it intends to offer at trial. To the extent that Goodman requests such notice, his request should be granted, although notice is not required until ten days before trial. His request will be denied in all other respects.

As to expert witnesses, the Government must provide a written summary meeting the requirements of FRE Rules 702-705 at least ten days before trial.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion to Dismiss for Selective Enforcement (Doc. 47), Motions to Suppress Evidence (Doc. 48) and Statements (Doc. 49), and the Motion to Dismiss Count Two on Second Amendment grounds (Doc. 50) be **denied**.

**IT IS FURTHER RECOMMENDED** that the Motions for Expert Disclosure (Doc. 51) and Notice of 404(b) Evidence (Doc. 52) are **granted in part and denied in part**, as described herein.

Finally, the parties are advised that they have fourteen days, or not later than November 10, 2025, within which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

s/*Abbie Crites-Leoni*

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of October, 2025.